The Honorable, the Judge of the United States Court of Appeals for the 4th Circuit Oyez, Oyez, Oyez. All persons having any manner of form of business before the Honorable of the United States Court of Appeals for the 4th Circuit are admonished to draw the aye and give their attention to the court of custody of the United States in this honorable court. Good afternoon. Please be seated. We're happy to hear argument number 161270, Raleigh Wake Citizens Association v. Wake County. Ms. Earle? Good afternoon, Your Honors, and may it please the Court, Anita Earles for the appellants. I represent the Raleigh Wake Citizens Association, the Concerned Citizens for African American Children, and numerous individual voters whose right to vote in elections for the Wake County Board of Commissioners and the Wake County School Board is unconstitutionally impaired. By recently enacted state statutes establishing new methods of election for those bodies. On behalf of my clients, many of whom are here today, we thank the court for granting expedited review in this case. What is at stake here is the proper application of the law with regard to two fundamental principles embodied in the Equal Protection Clause of the 15th Amendment. The first is the right to equal representation, the one person, one vote claim. The second is the right to be free from racial classifications and redistricting except where required by the Voting Rights Act or other compelling governmental interests narrowly tailored. I will address the one person, one vote claim and my colleague Allison Riggs will address the racial gerrymandering claim. Where, as in this case, the overall population deviation of a districting scheme is under 10%, the Supreme Court most recently affirmed in the Harris v. Arizona case that the plaintiffs must show that more probably than not, illegitimate considerations were the predominant motivation behind the plan's deviations from equal populations. That was the standard articulated by this court in Wright v. North Carolina, but not the standard applied by the court below. Before I elaborate on that further, I want to just say a word about the factual background. There was tremendous population growth in Wake County between 2000 and 2010. In 2011, the school board redrew its nine single-member districts, reducing overall deviation to 1.75% in that nine-member districting plan. That plan was used for elections in 2011 and 2013. In 2013, the General Assembly re-redistricted the school board over the objections of a majority of the board to impose a 7-2 plan, with two super districts with each overall a 9.81% deviation and seven single-member districts with a 7.11% deviation. Why don't you address the issue that you posed at the beginning of your presentation? I mean, we have the facts down. Thank you, Your Honor. In terms of the history of this. So the trial court found that those deviations that the evidence presented did not show those were caused by illegitimate factors. And the first problem is that they applied the wrong legal standard. In Wright, this court said, if plaintiffs prove that the desire to favor rural over urban voters or to have partisan favoritism, if that causes the votes of plaintiffs living in the overpopulated districts to carry less weight than the votes of voters in the underpopulated districts, then we have established a claim for relief. And in Harris, the Supreme Court said exactly the same thing. But the trial court didn't apply that standard. The trial court applied a rational basis review and said, well, what was the rational reasons that the legislature had for enacting these plans overall, examined those and said those are rational reasons, then the plaintiffs have not proven their case. I think you can argue this any way you want to, as my colleague suggested. But why don't you apply what you regard as the correct standard? Because that's the standard we're going to apply, the correct standard, right? Thank you, Your Honor. So the evidence that we have that shows the cause of the deviations, starting with the evidence of Dr. Joey Chin, he said, let's look at what might have caused this 5% deviation. And he's going to hold constant a plan that has deviations under 2%, keep towns whole to the extent possible, keep precincts whole to the extent possible, and draw compact districts. So he programmed a computer to draw 500 simulated districting plans, maximizing those criteria. And then he looked at what the partisan distribution of the districts that resulted. And what it showed was that the enacted districts were far off the chart. If you look at page 20 of our reply brief where we reprint Dr. Chin's chart, it illustrates how the districts that were enacted fall way beyond any range when you apply traditional redistricting criteria. So what is the point of that? We're not saying... I just want to be sure I understand, because we're all on the same page with the recent Supreme Court case. And we all know the facts here that the deviation is less than 10%. Right. So your burden is to show that illegitimate reapportionment factors predominated more likely than not. And what he did was use four legitimate redistricting factors. And he got this tiny... I think one of the themes in your brief is politics entered in here, partisanship. You, I know you've read these redistricting cases a million times, so you know that some kinds of partisanship, Supreme Court said is okay, right? Right. And the Supreme Court in Harris didn't take that back, did it? Correct. Indeed, it cited Gaffney and said that that was a consideration that you took into account. So none of Dr. Chen's... Have I got his name right? Correct. His name... Took that into account. And I wonder, maybe you can talk to us about that. No, I think that his analysis does take that into account. No, it wasn't one of his four factors. And then he talks about partisanship. And you talk about partisanship a lot. But we've just recognized that the Supreme Court says some kinds of partisanship, rough, political, even up ship, when you would favor one incumbent of one party and another incumbent of another party. But that all is okay. That kind of partisanship is okay, right? Right. We're talking about the deviations between the districts. That's what we're explaining. Not the plan overall. No, no, no, no, no. But he didn't take that into account when he made his study. Your Honor, the way he took that into account... Maybe you can tell me where it was in his report. Yes, if I'm... It would be useful to all of us if we would start, before we launch into the facts, you started out by saying that he had misapplied the law insofar as the 10%. It's one thing to launch right into it and try to figure out how it should have been applied, but we really need to understand the differences between what you allege how it should have been applied and why he did not follow what we said in right, but he did something totally different. If we launch into the facts on it, we can go anywhere with this, but we need to get the law first right as to whether that was done correctly. And our basic contention is that the trial court applied a rational basis review standard, and that's explicitly what the court said they were doing, rather than looking at what is the cause of the deviations. I thought it was interesting. He didn't even cite the right case at all in talking about the 10%. That's correct. He went into his own analysis of what that standard is. And further, Your Honor, he distinguished Larios and said it wasn't applicable. But the way that... He cited Justice Scalia to help that out in a dissenting opinion. That's... Not Justice Alito who gave the concurrent opinion that Justice Kennedy went the other way. Exactly. That is why we say he did not follow the correct legal standard. But I do want to say Dr. Chin's analysis does take into account partisanship because what he's looking at is the partisan makeup of the districts. And if you look at the chart on page 20, our contention is that if either of those districts had fallen within the 40% to 48% partisan range for the districts of the simulated districts, then we would have not proven that the deviation was caused by partisanship. But when you take away all the other possible permissible causes of the deviation, when you say it wasn't because of compactness, it wasn't because they were keeping cities whole... Those aren't the only ones. I'm sorry? Those four aren't the only ones. So then that gets to the... There are other considerations you can take into account, the topography. Correct. You can take into account communities of interest. And so that gets us to the... I mean, those are all Supreme Court cases. I'm not making them up. Right? Right. But I will note, Your Honor, there are cases that have ruled that plans with less than 10% deviation are unconstitutional because they're based on partisan, because the deviation was caused by partisan factors. What cases are those? Hume versus... This is cited in the lower court's opinion. There's a Court of Appeals case which would reverse a federal district court that found that you had not made out this claim. You have a case like that? No, Your Honor. We also don't have a case where the statistical evidence, similar to Dr. Chin's evidence, shows that when you draw 500 plans complying with traditional redistricting principles, you don't end up with the same partisan makeup as you did. There are other redistricting principles. I think what he's done is amazing. And the reason you don't have them is you couldn't do them back in the day. Twenty years ago, there wasn't the capability of coming up with all these alternative plans, right? But now he can, and good for him. We did address the other reasons that were brought forward in the legislative record, and the problem is that none of those explain why you need to make one district bigger than the other. So, for example, the desire to make it possible for people to vote for two members of the school board instead of one. You can do that with a perfectly apportioned plan. Representative Gill's plan would show that you can draw a 7-2 system and have a 0.32% deviation in the 7-district plan, and even smaller than that in the 2-district plan, shows that you can achieve all of those rational, legitimate considerations that came through in the legislative process in this particular case. You can achieve those without having districts that are malapportioned. And it's the malapportionment of the districts that makes them unconstitutional here. It's not simply that partisanship played a role, but that it caused the malapportionment. Well, I understand that, but I mean, it's the bad effect. But the thing, the bad effect, the bad cause is partisanship. And we would also argue rural versus urban. Rural versus, those are the bad causes. And all I'm doing is suggesting that when he put his four factors in, he didn't put all of the good factors. Well, I would also argue that some of the others were sort of not possible to put into a redistricting model. But we don't have any representations in the record. We don't have any facts like that, right? I mean, he didn't testify to that. But logically, Your Honor, he used the four criteria that the cases have shown are justifications for deviating from the one person, one vote factor. And I do want to say a word about Gaffney, because the difference there was that the deviations were caused by a desire to have the plan reflect the partisan balance of the jurisdiction, not because they were trying to give one party an edge over another. And those are two very different ways of partisanship. That leads me to a question that Judge Wynn may know the answer to, and everybody in North Carolina may know the answer to. But I don't know the answer. I don't want to answer it, though. I won't put you on the spot. But I don't know what the population of this district is, Democrats and Republicans. You didn't even put, is that in this record? Yes, it is in the record, Your Honor. Where is it? And that is at, give me just a moment. It's 20% African American. I understood that from the record. Is that correct? Yes, Your Honor. But in terms of the partisan makeup, if you look at JA 887 and 897, that shows you the, and here we're measuring partisanship based on performance, not registration, as the Supreme Court said in Cromartie v. Easley is the proper measure. So it shows that in the 2012 general election, 55% wrote Obama, 43% Romney, Democrats and Republicans. Oh, I know that. But I don't know, I know those voting figures. I agree with you. I know that. But that talks about a whole bunch of other things that are at issue in other North Carolina cases, right, about accessibility to a poll, to the election laws. Well, Your Honor, I submit it's relevant to the question of whether GAFNI applies here and whether or not the trial court was correct to say that what the General Assembly did complies with GAFNI or whether we're correct to say it is like Larios and violates the Equal Protection Clause. And I see my time is running out. I'm sorry. I'll give them a little extra time, too. What do you say that this says about this county? That what the General Assembly was doing in. . . No, no. What the statistics are. Oh, it shows that the Wake County is not politically balanced, that there's more Democratic voters in Wake County. And what's the percentage? There are three different measures here, but roughly 55% to 60% Democratic. So let's take an average between those 57% Democratic and then the alternate would be 43% Republican, is that right? Right. And so this would come to be 5-4, right? Right. But what the plan actually did was draw in the super districts a district that was much greater than that in Republican partisanship and overall was trying to create a plan that would elect five out of nine Republicans. So it was not. . . Thank you. Thank you. May it please the court. The court below was wrong on two fronts in rejecting RWCA's racial gerrymandering claim. It was wrong in its analysis of what can constitute evidence of racial predominance, and it misapprehended the expert evidence so fundamentally that it was clearly erroneous under Easley v. Cromartie. On the law first, though, the elements of a racial gerrymandering claim are well established. It is plaintiff's burden to prove that race predominated in the drawing of the challenged district. After satisfying that, the burden then shifts to defendants to prove the use of race was narrowly tailored to advancing a compelling governmental interest. First, one of the trial court's errors was its legal analysis of the evidence that can be used to prove that race predominated. So you can use both direct and indirect evidence to prove racial predominance, but no one of those categories is solely dispositive, and the evidence should be viewed cumulatively. The direct evidence that we presented included Representative Stam's repeated reference to the tendency of at-large districts to submerge minority voices and his specific reference to the ACLU's lawsuit in Ferguson, Missouri, challenging at-large districts. The indirect evidence that plaintiffs summoned is actually much more voluminous, though, and it falls into three different categories. The first is the shape of the district. Plaintiff's expert, Tony Fairfax, found that District 4, the district we challenged as a racial gerrymander, was significantly less compact mathematically than previous school board districts or the Gill alternative districts. We also presented a racial density map at JA781, which demonstrates how the district lines precisely track race and have appendages that reach out to grab concentrated black population. The second category is the splitting of precincts by race. In the seven-single-member part of the 7-2 plan, the only precincts that were split were the ones split to construct District 4, and splitting precincts means you're not basing the decision on where to split that precinct on partisan data because it doesn't exist at the sub-precinct level. We also had testimony from Janet Barnes, a longtime resident of the region, about how her precinct was split on the basis of race. The final category of evidence we summoned was statistical evidence specific to the challenged district, and that transitions us to the trial court's second major error, which was its misapprehension of the Chen testimony. What Dr. Chen's report showed, properly understood, was that with extremely high statistical significance, racial packing of black voters was the predominant factor in explaining the district lines. None of the 500 simulations he ran produced a district with as high a black voting age population, 53.4, and in fact, when you respect traditional redistricting criteria, most of the districts end up being less than 50%. Then, to determine whether partisanship could explain how the lines in District 4 were drawn, he looked at a subset of those simulations that achieved the same partisan-level performance, and he found even amongst those subsets, no district was simulated that had this high a level of black voting age population in a race-neutral but partisan-motivated simulation. So he was thus able to prove that partisanship didn't drive the extreme racial concentration in District 4, and as a result of misunderstanding the Chen analysis, the district court clearly erred in finding the analysis unreliable. Because no evidence on compelling governmental interest and narrow tailoring was presented, RWCA wins when it proves that race predominated, and we respectfully request that you strike down District 4 as an unconstitutional racial gerrymander. Good afternoon, may it please the court. My name is Charles Marshall. I'm here on behalf of the Wake County Board of Elections. I'd like to join Ms. Earls in thanking the panel for the expedited appeal. I know that's important to my client and its position. I'd like to begin, Judge Mott, you mentioned about politics being a legitimate consideration. Some politics. The Supreme Court has held, as you said, that politics can be a legitimate consideration in districting. They've also held that minor deviations under 10 percent from strict mathematical equality are also permissible. Let me read on the first point that the Supreme Court has held that politics can be a legitimate consideration in redistricting. Sure. Well, Judge Wynne, in the one-person, one-vote cases, both Gaffney and now Harris have mentioned that, at a minimum, seeking to achieve some sort of competitive balance or rough political fairness is, in and of itself, a traditional criteria. In the Alabama Black Legislative Caucus case, the court listed political affiliation itself as one of several different legitimate districting criteria. And in the Cromartie case as well, politics has been cited as a legitimate consideration. And in all of those cases together, the fundamental point is there is a level of politics and political consideration that is, as Gaffney says, inevitable in any redistricting plan, just as population deviations are inevitable in any redistricting plan. So where here we have an allegation of a political consideration and an allegation of a deviation under 10 percent, there has to be additional proof because otherwise every single districting plan would be subject and exposed to a legal challenge as long as there is a deviation. Do you think it makes a difference that this is not a redistricting plan, this is a re-redistricting plan? I don't think it makes a difference in this consideration, Your Honor, because the General Assembly was authorized to conduct a redistricting plan if it chose to do so. Yeah, most legislators look at redistricting as the horribles that have to go through every 10 years. Most people don't look for opportunities to do it more frequently than 10 years. It's kind of strange, isn't it, that they want to take on this arduous task again? Well, I certainly can't represent what the General Assembly's motivation was at the time. Motivation we did. Right. Isn't that sort of counterintuitive in and of itself? Not necessarily. I certainly don't think it proves any sort of impermissible political motivation or impermissible geographic bias. It just reflects that whatever decision, policy decision they had to redistrict these particular districts. We have to deal with the philosophy of why we give deference because, look, this is forced upon them. You have to do it because every 10 years is census. So we say you can't do it exact. But when you've already done it in 2011 and you almost got it perfect, the deviation is incredibly good. And then you come back and re-redistrict with numbers like this because it's just under 10? Well, in the seven-district plan, Your Honor, the maximum deviation was 7.11 percent. And what the plaintiffs have admitted here, and under Harris they're exactly right, their burden is not simply to prove that there's political concession somewhere and a deviation somewhere. They have to prove that the deviation was created intentionally to achieve an impermissible political objective. And they haven't done that here on two fronts. They have not proved that the deviation itself was used to create this impermissible political result. In fact, there's really not any direct evidence that the legislature intended to use, much less even knew what the deviation was at the time they were creating the districts. The only peak we have into that was the amendment by Representative Stam who said we're going to change these lines between the original bill and the new bill in order to promote continuity on the school board and make two districts a little more winnable for two incumbents, one Republican and one Democrat, going back to rough political fairness. The result of that amendment, Your Honors, was that three of the districts went from being overpopulated to underpopulated. That wasn't because the General Assembly decided let's underpopulate this district. It was because they decided they wanted to promote continuity on the school board by trying to make two districts more winnable for one Republican and one Democrat. What that shows is there's no direct evidence that the General Assembly had any intention with respect to how they were going to create the deviation. The only evidence in this record that even attempts to show that the deviation was used to create an impermissible political result is Dr. Chin's testimony, and the district court was well within its rights to discredit that testimony because what Dr. Chin did was say you can only create three Republican districts, alleged Republican districts, under his 500 simulations, if you have a maximum 2% deviation and you have maximum compactness and you hold splits down to a minimum. And then he said, but at 7% you have four Republican, alleged Republican seats. And he wants to draw the conclusion that somehow that 7% was the trigger to create the fourth seat. We don't see what the 3% results are, the 4%, the 5%, the 6%. We don't know if he relaxes compactness, if he takes other communities of interest into consideration, not just political subdivisions, political affiliation, any number of the traditional criteria that he could have applied. And if we had different combinations at different deviation levels, there might be something we could glean from those results, but we don't. We have these narrowly constricted criteria. I would complain to say that the district court here did not follow our directive in this earlier case and did not apply what we know now to be the correct standard because of the Supreme Court case. Whether you think ours was right or not, in any event, the district court should have followed it and now should have followed it for sure. What do you have to say about that? First, the district court followed this court's instructive and right, which is they had to prove bad faith, arbitrariness, or invidious discrimination. That's what this court said, citing Daley, and that's exactly what the district court did. The district court made a number of factual findings. That they failed to prove a prima facie case was the product of bad faith, arbitrariness, or discrimination. That's from this court's decision and right. That they failed to prove their ultimate burden to prove the same thing. That was a running paragraph in the opinion, by conclusion, most of it. Well, it was after the district court had made a series of fundamental factual findings about the evidence presented and he applied that to the very standard of right and Daley. And we would agree that Harris doesn't change that standard. Harris requires that illegitimate criteria predominate over legitimate. If anything, Harris would strengthen it to say not just proving invidious discrimination, but to the predominance of a traditional criteria. But it doesn't matter because the district court. The district court also talked about rational basis at some point. Your Honor, the district court did talk about rational basis, and it went to pains to say that it was unclear from the precedents how rational basis review would fit in. And it did conduct a rational basis analysis, but it did not rely on that as the product for its holding. It was more of a factual background and analyzing what the goals of the legislature might be. But at the end of the day, the district court very carefully and exhaustively applied the facts to the standard set forth in right. And it did not say we find there's a rational goal here for the legislature to redistrict, and therefore there's no other evidence that needs to be taken or considered. When was this case tried? This case was tried in December of 2016. And when did the district court opinion come down? It came down in March. And then Harris came down, obviously, after that. And then you asked us to expedite it. And here we are. That's right. That's exactly right, Your Honor. Other than Dr. Chin's analysis, which the district court properly refused to credit, there really is no other direct or even inferential evidence on how the deviations were used to create this result. And I would contrast this with Lariat's. And this court did say in reversing the motion to the order of dismissal earlier, this court did say that Lariat's was a decision in which a district court and summarily affirmed by the Supreme Court had found a violation of one person, one vote. But the plaintiffs didn't prove Lariat's when it came to trial. Did the plaintiffs have to negate all of the legitimate grounds? No, Your Honor. The plaintiffs had to prove illegitimate criteria predominated over legitimate. The district court properly found that the plaintiffs didn't prove the use of any illegitimate criteria to create these deviations. In Lariat's, the exact opposite happened. And Lariat's, I think, fundamentally exposes. Well, the state fessed up in Lariat's. They thought the 10 percent was a safe harbor. Right. And not only that. They said that these were the causes. Right. Not only that, Your Honor. And I think it's important. They went further than that. They said we need to create more rural districts in southeast Georgia. And in order to do that, because it's so underpopulated, we're going to have to use the deviation to have as many small populated districts as we can so we can literally draw a district out of thin air. So we want seven seats instead of six seats. That didn't happen here. Not only is there no evidence of the use of the deviation to create a political result, there's no evidence here like in Lariat's that the legislature intended to somehow disfavor an entire region of a state. And that is important because here the super districts, the allegation was that this plan created a rural and an urban district and disfavored the urban residents. And the super districts were one and one. They created A and B. And first of all. Right. I think the argument is that if you put some in the overpopulated urban district into the rural district, maybe the urban voters would have had a chance at the super delegate from that district. Well. I mean, I think that's where the argument goes. Your Honor, if there's a district A and district B, though, unlike Lariat's, there's only going to be two districts. I understand. But they want both. Right. But they're OK. Politicians are greedy. Right. But, again, Your Honor, there's no proof that they used the deviations to create a result where one of the districts had to be a Republican. Again, they looked at you looked at the Chin data again, but it's the exact same flaw. You can't draw the conclusion from Chin's data they want to because it doesn't it's it doesn't have a reasonable sampling, all these different possible criteria in order to show that this 7 percent or 9 percent in the super districts was the trigger. And absent that causal proof between the deviation itself and the political objective, we're left really with, and I know I've said this before, but ultimately we're just left with a political gerrymandering claim because what the claim is, well, there are more Republican districts than Democratic districts. But if there's no proof that the deviation was used and was necessary to create that, then we're just talking about where the districts motivated by politics. And that's not enough to prove a one person one vote case because it doesn't link the actual deviation. And just because the deviation is 7 percent and not 1 percent or 2 percent, the legislature isn't required to go back and redo the districts to get closer to 2 percent. That's do you contend that urban versus rural and suburban is a legitimate consideration for redistricting? Absolutely, Your Honor. You think it is? It is because you are allowed to take communities of interest and they don't have to be necessarily municipal boundaries. You can consider the needs of urban, rural and suburban districts. And I'll say I put this in quotes in the brief. It's not clear the super districts were necessarily urban and rural. Certainly there's more rural area in the outer one. I would certainly acknowledge that. You don't think that's really like an ostrich putting their head in the sand to ignore that those differences in America, very clear, have implications far beyond just community interest? Our country has been explosive over the last 40, 50 years over school districts and urban and busing. This very courtroom itself, those cases, Virginia cases and Swan and Mecklenburg cases, you're saying that that's just vanilla. When you say urban school district, it has nothing to do with race or any consideration? No, Your Honor. I'm saying that as part of a legislator's districting considerations, they can take into account the different needs and interests of different rural, suburban and urban communities in a number of different ways and balance those. But kids should be educated differently if they live in the city versus the county? No, not at all. Well, I thought education was the driving force of school board districts. I'm sorry? Yes, I thought that was the whole idea, was to improve schools. That's what the district court said, this would improve schools. Right. How did it improve schools? In this case? How did it improve schools? In this case, what the court found was that it allowed voters to elect an additional representative to the school board. And that improved the school? Well, the testimony from the bill sponsors was that sometimes a family had a student that lived, went to school in a different district from where they lived, so if they could vote for both a super district representative and a district representative, they'd be able to elect two. And the district court credited all of that, didn't it? Yes. But didn't credit the evidence that some people said that I have districts, people, their parents don't live in the district, but I always consider them in terms of educational interest. It actually, what the district court said, I believe that they believed that and that they would try their very best to represent everybody. But at the end of the day, it didn't contradict, the district court found that it didn't contradict the reasonable inference that being able to elect two school board members could be preferable than being able to elect one. It seemed like the district court credited the legislators who didn't testify, I mean credited the ones who did testify and the ones who did testify didn't. They were the ones who were on the oath and before them. And he said people who are, several times, if you are an opponent to the bill, then he discounted it. Why would that be? Well, because there's a Fifth Circuit and a Second Circuit case, the Veazey case and the Butts case, and both say it's less. Fifth and Second? Fifth and Second, right. Okay. And it's less about the actual credibility of the witness as a person. It's more about the fact that from a factual foundation that it's going to necessarily involve a degree of speculation and conjecture in order to say what the opponents think the motivation of the bill sponsors were. And in both those cases, the district court did credit the testimony of the bill sponsors because they were the, in terms of motivation, they were the representatives whose motivations were at issue. And categorically discredit the opponents? Well, the district court can make that determination, Your Honor. And in doing so, That's called abuse of discretion, isn't it? No, not in this case because not accepting the other testimony, the opponent's testimony was the motivations were pretextual. So the district court can weigh the evidence and decide whether he thinks it's pretextual or not. I agree, weigh, but that's a matter just to categorically disregard as that's what it did. I don't get disregarded, Your Honor. If you're an opponent, I don't credit that. The district judge heard all of the evidence. Does that make a difference? I, too, was a little disturbed at that. So if we put that back in the mix, does it make a difference? No, it doesn't make any difference. Why? Because that was only offered to say, well, the bill wasn't necessary. It wasn't necessary to have two rather than one school board members. But, in fact, it's reasonable for the district court to conclude, well, that was a legitimate motivation, and if it, in fact, gives you two school board members rather than one, the fact that they believe it's not necessary or could be achieved in a different way doesn't make the underlying goals unreasonable. The witnesses that testified that I take other people's, out of district people's concerns in mind, they were saying that this isn't necessary to have these two. Right, because I'll already do that. And that doesn't change the fact that it still allows you to do that. So, basically, whatever reason they gave, the plaintiffs couldn't win the case then. The logical extension is whatever they would say was the reason, no matter how disconnected it was factually, then it didn't make any difference. Well, Judge Gregory, at the end of the day, the plaintiff's burden was not to necessarily just show that the goals were not necessary. The plaintiff's burden was to show that the deviations here were created in order to achieve an impermissible political objective. And if I know my time is running down, I want to make two quick comments on partisanship because in no way does the evidence demonstrate impermissible levels of partisanship. The judge found degrees of rough political fairness. He found five to four voting registration stats. He found four to five, in other words, five for Democrat voter registration in the districts, four or five presidential data. He found split ticket voting, especially in District 1, difficulty in predicting partisan performance based on the fact that the 2011 school board maps, which the plaintiffs alleged to be drawn to favor Republicans, actually produced Democratic school board members. And so the judge also found that the evidence of partisanship failed to take a complete picture into account. Mr. Fairfax, the expert, didn't take into consideration registration data. He only looked at 04 and 08 data, which is now eight years old. He didn't take into effect unaffiliated voters in Wake County, the independence of Wake County voters, and the local nonpartisan races like superintendent of schools, which obviously is more related to education, nor did he compare board of education races against presidential data to see whether there's a correlation. And that's the point I need to drive home before I sit down. With respect to the school board races, the allegation is that it favored certain policies over other school education policies. Whether I vote for Mitt Romney or not doesn't have any correlation to how I may view magnet schools or year round schools. There's no evidence in the record that the General Assembly had any data about the policy preferences with respect to education of voters in each of these districts. There was no attempt to define what makes a particular education policy progressive or conservative. There was no link at all between partisan affiliation and various policy preferences in education, which can change all the time, and it's impossible to measure how any specific policy preference might impact a vote. And on that basis alone, it's not possible to find any evidence of impermissible partisanship. So no expert could ever be really credited because you could always find out there in the cosmos some legitimate reason that you didn't put in your calculus. You don't understand that? I'm sorry. You didn't understand that? I'm sorry. No, I didn't. You're saying that what the district court said, you didn't do what I wanted you to do. Your expert report should have done this and, therefore, I totally find you not credible and not use it at all. But then if that's the case, then you could always find something in the universe of legitimate reasons and say, aha, you didn't put that in your calculus, therefore, you're not credible. Well, in this case, Your Honor, the district court. Totally credible. Not less weight, but totally not credible, in quote. Not total, but not credible. And then discounted completely because the district court didn't like the way the calculus was because there was something else that he would have preferred something better or different or was available. Well, all the district court said, Your Honor, was with the limited number, the limited and narrow window of districts that he performed, it was not a reliable method to extrapolate partisan motivation of these particular districts based on the criteria he used and the method he used to develop those samples. That was the extent of the reason that he found it not credible besides the partisan data he said was not credible. All expert testimony doesn't hit a home run. Some hit singles. So you're saying if it doesn't do completely everything, it can be totally discredited. That's what the district court basically concluded. So along that same line, how could plaintiffs approve the case here? Your Honor, well, we saw that in Larias. We saw they could approve the case through additional expert testimony. We could have had different with respect to partisanship. I just mentioned all of the different incomplete items. I thought, and you can certainly correct me if I'm wrong, but I thought that Larias contained one really significant factor that this case doesn't contain, and that was that the defendants basically confessed error. They didn't think it was error. They thought if they were under 10 percent, they were okay. But they were confessing bad motives for this and bad motives for that. Failing that kind of admission from defendants, how does a plaintiff prove this case? Well, they have to prove a causal relationship between the deviation and the illegitimate objective. And Dr. Chen was attempting to prove that. And I just gave a number of scenarios of, again, I know at some point, you're right, Judge Gregory, it's impossible to design a simulation that's going to take everything into account in every possible deviation. But there's certainly a number of different types of plans he could have used in his simulation that would have been far more probative to see whether or not the 7.11 percent truly was a statistical outlier. Let me ask you another way. Suppose that the district court here had said, you know, this isn't perfect and it doesn't take into account a lot of other things that should have been taken into account. But I'm going to find judgment for the plaintiffs. Would you be appealing? I'm sorry. I want to make sure I get this right. The district court would look at all the evidence in this case. Right. And would say, you're right, Dr. Chen, it doesn't take into account geographic problems. It doesn't take into account good politics. It doesn't take into account fundamental fairness to different political parties. Right. It doesn't take into account communities of interest. But I'm still going to find for the plaintiffs. Would you be appealing? I'm in a difficult situation because of the kind of client I have. But as a legal matter, yes, I would think that was. Why? Because that was the only evidence. That's the only evidence. He looked at all of the evidence. Right. And that's the conclusion he comes to. And the conclusion he comes to is that the plaintiffs win. But the facts, the underlying facts, the deviation is the same. Right. But all of the expert testimony is the same as it is here, but the district court just makes a different call on it. Right. So do you appeal? But here's why I say yes, Your Honor. Okay, I want to hear that. This is important. And I said when I first began the argument that the only evidence, the only evidence they presented to try to show how the deviation was used to create this result was Dr. Chen. The rest of the fact testimony only went to whether the districts were partisan or not. And to me, that's a partisan gerrymandering claim. That's not a one-person, one-vote claim. So if the district, if there was more evidence of how the deviation. No, the same evidence. Right. But there is no other evidence of how the deviation. I don't think that the plaintiffs would have met the standard, even if the district court had held that they did. That would be clear error. We would reverse, right? I just want to know what your position is here. This isn't a trick question. No, I know. My position is clearly the district court is allowed to find facts. Right. Right. And they can find facts. If the district court found facts on this evidence that, and maybe this is, I think, what you're asking me. If the district court was able to find facts on this evidence that the population deviations were used to create an impermissible and illegitimate partisan result, and that was his finding, then we'd have a really tough time appealing. Okay. Okay. So what I'm asking you is he looked at Chen's, because we were going back to Judge Gregory's question, and we have exactly the same testimony from Judge Chen. I'm promoting him or not. I don't know how he'd feel about that. But anyway, Dr. Chen. And we have exactly the same testimony from him. And the district court recognizes the problems in the testimony. Right. It doesn't consider communities of interest. It doesn't consider good politics, rough fair advantage for each party. It doesn't consider preserving incumbent seats. It doesn't consider the geographic problems that may, differences that may exist. But it still says, even so, this is some evidence of something. And I'm going to find for the plaintiff. So would you be appealing? And if you were, what would be your argument? Well, again, if the district court made factual findings that said. I told you the factual findings they made. Right. But that was respect to Chen. But if they found that there was. All the rest of the evidence is the same. Right. Because the district court is making factual findings based on the record, we'd have a very difficult time appealing to show clear error. But my only point is the only evidence in this case that was offered to show whether the deviations created the political result were necessary. Right. There wasn't any showing. There's no showing in my example about that. Right. There's a showing that Chen's evidence shows us something. Right. And I'm going to ignore these other things. Right. That's the fine of the district court. And, Chen, well, then my argument might be that the court may have applied the wrong legal standard because the standard would be that the illegitimate criteria had to have caused the deviation. The illegitimate criteria, I keep going back to this causal link. So if the court didn't have any findings that related to that causal link, then I think the argument would be that it didn't apply the correct standard. Okay. Thank you. Thank you. And I know I didn't get a chance to address District 4, but I'll rest on my brief unless the court has questions. Thank you. Your Honors, I need to start with this notion that there was no other evidence in the record showing that partisan factors caused the deviations. That's simply not true. To begin with, you have to understand, we did try to subpoena legislators who supported this bill. They claimed legislative privilege. We tried to get communications we thought we were entitled to. We got a very narrow set of those communications on the eve of trial. I did notice that. Right. So my point is that we, in those e-mails, there were statements between the chair of the Wake County Republican Party and Senator Hunt, who was backing the school board bill, saying that we don't think this bill is going to go far enough to get us the five out of nine. And Senator Hunt responds, well, yes, it does. Talk to Brent. He's explained it to me. And then there's evidence of meetings. That was as close as we could get to testimony about what really went on behind the scenes in terms of what their motivations were, in very contrast to Larry Ellsworth, the people drawing the plans came forward and explained why they drew the districts. There was also, however, I think this is a use, the Tenet case, which is cited in the lower court's opinion, is very useful here because in Tenet, it's a congressional redistricting case decided in 2012 by the Supreme Court. But the Supreme Court has different standards for congressional redistricting than they do for local ones. Right. But once you, in Tenet, any deviation has to be explained. Here, we're saying once we've shown that there is some partisan influences, then what's the burden of the state? And in Tenet, the court, and this comes directly from Karcher, it's a four-part test, the size of the deviations, the importance of the state interests, the consistency with which the plan as a whole reflects those interests, and the availability of alternatives that might substantially vindicate those interests, yet approximate population equality more closely. And we have those in this case. We have the Gill Amendment that met all of the state interests that sought to be vindicated here without having close to 10% deviations. We had high deviations. What's really missing from this case, once you take into account the evidence of the partisanship that was going on in this re-redistricting, is no logical explanation for why Super District A, the inner district, had to be larger than Super District B. What explains it? Was there some city they were trying to keep whole? Did they think it was going to be more compact? No. The only thing they were trying to do was give rural voters more power, give their voting strength more strength than the urban voters. So on the question of what level of partisanship is permissible, my answer is any level that doesn't weight voters' votes differently. So, again, going back to that chart on page 20, if the partisan makeup of the districts had been in that 40% to 48% range, if it was 40 versus 48, if it was 48 versus 40, that would be constitutionally permissible because you wouldn't be weighing one set of voters' votes greater than the other because of their party affiliation. So, yes, there is room in the system for partisanship. If partisan factors drove why they wanted seven to instead of nine single-room districts, fine. But what the Equal Protection Clause says is you can't give some voters greater voting strength than others based on where they live or what party they belong to. And so the notion that it's okay to take into account communities of interest, yes, that is correct. But Larios v. Cox stands for the proposition that you can't go overboard. You can't say we really want to make sure these rural voters are heard, so we're going to give their votes more weight than urban voters. If you want to draw a district that combines them in a way that gives them the ability to elect somebody who will represent their interests, great. But you can't say those voters also get to have stronger voting strength than the voters in the urban areas. So that's the limit that the one-person, one-vote principle applies, both to considerations of partisanship, which are permissible, and to considerations of communities of interest that are permissible. And I see that my time has run out, so unless there are questions. Thank you very much. I understand from the clerk that somebody here clerked for Judge Butzner, and we welcome you back. We welcome all of you. We will ask the clerk to adjourn court, and then we will come down and greet the board.
judges: Diana Gribbon Motz, Roger L. Gregory, James A. Wynn Jr.